# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 15-cr-10012 |
| ) | |
| KIANTE SIMMONS ) | |
| ) | |
| Defendant. ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Defendant Kiante Simmons' Motion to Suppress (Doc. 11). For the reasons stated below, the Court will forego a suppression hearing and DENIES Defendant's Motion (Doc. 11).

### BACKGROUND[1]

Defendant was indicted on two counts for possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841 in November, 2014. (Doc. 1 at 1). The facts underlying his indictment are largely undisputed. On or about November 17, 2014, the Defendant was arrested by City of Bloomington Police in McLean County, Illinois on suspicion of delivery of a controlled substance. Defendant does not challenge the propriety of Defendant's arrest in this motion.

---

[1] These facts come largely from the Defendant's Motion and police reports attached thereto by the Defendant.

1

On or about November 18, 2014, the Defendant made several telephone calls from McLean County Jail, which law enforcement recorded and monitored. Defendant was observed making several calls to multiple women, believed to be Dana Connor, Angela Powell and Erma Pitchford.

At about 1:18 a.m. on November 18, 2014, Defendant called a phone number registered to Dana Connor with a Chicago area code. During this phone call Dana asked Defendant "if his shit is safe." Defendant told Dana he was not sure but would like for her to come and get it. Defendant told Dana he did not have much money but had like "12 of them". She asked if it was at his Uncle's and Defendant responded that he would tell her more when she visited him.

At about 1:35 am Defendant called a 309 area code number registered to Angela Powell. He inquired about the truck in which he was arrested. She responded that the vehicle was impounded and there were hefty fees—$400 plus an extra $20 every day—that needed to be paid to retrieve the vehicle. Defendant told Angela to come see him so he could tell her how to go certain places and get something, presumably the money to retrieve the vehicle. Defendant told Angela not to let "them" come to their house because "they" had no right. Defendant then stated he wished Angela would come and see him so he could give her the numbers and she could get "it". Angela responded that she understood what Defendant was talking about.

Defendant called Dana again at about 11:47 a.m. that same day. He explained he needed to get the "12" into her hands so she could do what she needed

to do. Dana implored Defendant to tell the truth about where "it" was and Defendant admitted "it" was at a "bitch's crib."[2] Dana asked for details about the woman and what the woman knew about Defendant's property. Defendant explained that Dana would need help to carry "the big one" that he once took from Erma's house. Dana gave Defendant another phone number to call her. Dana slipped up and referred to "the big one" as "the safe" and Defendant became unhinged asking rhetorically why she would use that word. He attempted to mollify Dana and convince her he intended to sever all ties with Angela once this ordeal was over. Dana expressed reservations on dealing with Angela but Defendant was steadfast that he needed her to do what he was asking.

At about 1:42 p.m. that same day Defendant called Dana again but at the new number. Defendant explained that he surmised that he "served" an informant and he thought he knew who it was. Defendant explained to Dana that his goal was to get "the shit" to her and she could "keep it moving." Dana expressed reservations due to Defendant's relationship with Angela. Defendant kept trying to steer Dana away from worrying about Angela and focusing on the task at hand, which was retrieving "the stuff" and "keeping it moving". Dana asked about retrieving clothes and Defendant again expressed his intent on Dana only retrieving the "whatchamacallit, the big thing" and not worrying about anything else. Defendant gave her Angela's phone number and Dana tried to set up a three-way call but the phone disconnected upon the attempt.

---

[2] "Bitch" is a misogynist pejorative term sometimes used to refer generally to a woman.

3

Defendant called Dana back at 1:56 p.m. and stayed with her on one line while she called Angela on a different phone. Defendant instructed Dana to tell Angela she was his cousin and she would be coming down to Bloomington and get "the whatchamacallit". Angela explained that there was "the one big thing" there and Dana confirmed she would come and get "the big thing". Dana was distraught having to deal with Angela but Defendant told Dana to be strong. Dana told Defendant to give her the stuff. He responded by saying: "From zero 3 right turns to 37, 2 left turns to 2, and 1 turn right to 73." Defendant then repeated that there are "12 in there" and $700.00. He then instructed Dana to give Angela $400. Defendant again called Dana later at 4:48 p.m. and she wisely told the Defendant he was being monitored and the authorities were listening to his calls.

Meanwhile on or about 2:50 p.m. on that same day, an Officer Raisbeck, who had been monitoring Defendant's calls, and Detective Brown went to Angela's residence to try and get the safe. After entering Angela's residence, Officer Raisbeck "explained to Angela that [they] were there specifically looking for [the Defendant's] safe." Officer Raisbeck "told Angela [he] knew the safe was there because of the phone call [the Defendant] made to her and his girlfriend, Dana, in Chicago". Officer Raisbeck then "explained to Angela [he] thought [the Defendant] was just using her for a place to stay while in Bloomington." Officer Raisbeck asked Angela if she was aware of a safe that belonged to the Defendant, but Angela initially said she had no knowledge of a safe. Officer Raisbeck "retrieved [his] digital recorder from [his] pocket and played the portions of the phone call [he] had recorded from

[Defendant's] phone call to Dana." According to Officer Raisbeck's report, the purpose of this was "to allow Angela to listen to how [the Defendant] was using her and was planning on cutting ties with [her] and heading back to Chicago to be with his real girlfriend, who he wanted to spend the rest of his life with."

After hearing the recording of the telephone call, Angela became visibly upset and changed her story on the existence of a safe. Angela then stated she was aware the Defendant had a safe in the bedroom but was not aware of what the Defendant had place inside it. Angela became concerned about herself being arrested, and asked Officer Raisbeck if she would be arrested if anything illegal was found in the safe. In response to Angela's concerns, Officer Raisbeck told Angela "that it was [his] understanding that the safe [was Defendant's] and not hers" and told her "it was not [his] intention to charge her with any crimes." Angela also asked for help getting her vehicle out of impound, to which Officer Raisbeck promised to speak with his supervisor and ask if the department would waive the tow fee for her vehicle. Angela then signed a consent form allowing law enforcement to search her residence and seize the subject safe. Angela showed Officer Raisbeck and Detective Brown where the safe was and law enforcement took custody of the subject safe, without a warrant, and left Angela's residence.

The police took the safe to the police station, applied for and received a search warrant to open the safe, and did ultimately open it using the combination the Defendant had given to Dana in the jail telephone call earlier on November 18,

2014. The safe contained approximately 12 ounces of crack cocaine, which is the evidence relating to Count II of the Indictment.

Now Defendant seeks to exclude the evidence retrieved from the safe as fruit from a poisonous tree because the safe was seized without a warrant.

## DISCUSSION

The Fourth Amendment of the United States Constitution protects people against unreasonable searches and seizures. Generally, the seizure of personal property is "per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009) citing *United States v. Place,* 462 U.S. 696, 701 (1983). However, there are judicially recognized exceptions to this general rule including instances where authorities have probable cause to believe a receptacle contains evidence of crime or contraband and the exigencies of the circumstances demand dispensing with the usual requirement of obtaining a warrant in seizing the receptacle. *Id.* citing *Place*, 462 U.S. at 701. This is easily such a case.

In *James*, the Seventh Circuit affirmed a district court's decision not to suppress evidence used against a defendant gained by law enforcement without a warrant from a third party. 571 F.3d at 709-710. Specifically, James was a suspected bank robber. *Id.* at 711. Authorities had unearthed several indicia of guilt that prompted them to visit James' residence, which at the time was his mother's home. *Id.* Authorities proceeded to visit James' mother's home with his counsel

present. *Id.* His mother directed the authorities to a safe she said belonged to James and contained a handgun belonging to James. *Id.* The authorities confiscated the safe and did not even bother obtaining a written search permission form for the home. *Id.* The mother also provided the authorities with the code for the safe. *Id.* The police later obtained a search warrant for the safe and opened it, finding contraband including a gun that matched descriptions of the gun used during the first robbery and receipts and other evidence of large cash purchases that James had made in the time period immediately after the robberies. *Id.* at 711.

James challenged the warrantless seizure of the safe on the grounds that his mother had neither actual nor apparent authority to consent to its seizure. *Id.* at 714. The court rejected that argument because under the law "[c]onsent to a search or seizure may be obtained from any person who has common authority over the property (actual authority), or who would appear to a reasonable person, given the information that law enforcement possessed, to have common authority over the property (apparent authority)." *Id.* (citations omitted). James' mother had control over the safe in her own home. *Id.* The court held that James assumed the risk that his mother would consent to the safe's seizure, thus she had apparent authority over it. *Id.* In any event, the court also held a reasonable person with the knowledge the authorities possessed, would believe that James' mother had joint control of the safe in her house. *Id.*

Here, there are ample facts that support the conclusion Angela had authority to allow police to seize the safe. Warrantless seizures are constitutionally

permissible where there is probable cause and exigent circumstances create a compelling need for action and there is insufficient time to secure a warrant. *See United States v. Rivera*, 248 F.3d 677, 680-81 (7th Cir. 2001).

First, there are recorded calls from Defendant to Dana and Angela alerting law enforcement to the existence of contraband or evidence of Defendant's crime in the safe at Angela's house. Defendant called Dana and informed her there was "something big", that it had twelve in it, and that Dana was to hurry up and get it out of Angela's house and keep it[3] moving. Moreover, Defendant explained Dana could use the goods in the item in lieu of money. Defendant also called Angela and referred to her home as "their" home and expressly implored her not to allow anyone to get "the thing" that was left in their house. He also stated his wish for her to come down and get the numbers so she could get money out of it. He was clearly referring to a combination to get into the safe he left at her home. Any reasonable law enforcement official would be led to believe there was contraband or evidence of Defendant's crime in the safe at Angela's house.

Second, there was ample reason to believe Defendant was arranging for the immediate removal of the safe before law enforcement authorities could get to it. In Defendant's calls to Dana, he consistently urged her to get the safe and to do it soon. Dana even called Angela while the police were present and explained to Angela the need to get the safe out of her house before the authorities could obtain a

---

[3] It is not clear from the context of the conversation whether Defendant was explaining to Dana that she could keep the drug selling enterprise going or whether she could keep the safe moving so law enforcement could not find it. Either way, Defendant was authorizing Dana to control the safe.

search warrant. Given the Defendant was arrested for making a drug deal and was making several calls urging for his female associates to get the safe, the Court finds any reasonable, experienced law enforcement agent would believe the safe and its contents might be destroyed or permanently removed before a warrant could be secured. *United States v. Rivera*, 248 F.3d 677, 681 (7th Cir. 2001).

As for the safe itself, the "common authority that allows third-party consent rests on the mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). There is no dispute that Angela had common authority over the <u>premises of the home</u> as it appears it was primarily her home and Defendant only resided there to operate his activities in Bloomington. Angela allowed the police into her home and directed them to the safe, so there is no issue of coercion. That the police used Defendant's contempt for Angela against him is similarly a non-issue. Angela's apparent control over the safe itself is of minor significance here because the authorities did not conduct a warrantless search of the safe. *See, e.g., United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000). Instead, they waited until they had a proper search warrant to search the safe.

In sum, the Court finds that the warrantless intrusion into Angela Powell's home to retrieve the safe and the seizure of the safe were not unreasonable or otherwise in violation of the Fourth Amendment.

Neither party requested a hearing on the instant motion and the Court sees no need for one. Although the Seventh Circuit has described the disposition of a

9

motion to suppress as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity . . . to hear the testimony and observe the demeanor of the witnesses," *United States v. Kempf,* 400 F.3d 501, 503 (7th Cir. 2005), the facts here were not in any serious dispute. Moreover, the case law is sufficiently clear such that resolution of this motion would not be significantly aided by a hearing. *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion.")

## CONCLUSION

IT IS THEREFORE ORDERED that for the foregoing reasons, Defendant Kiante Simmon's Motion to Suppress (Doc. 11) is DENIED. Jury Trial in this matter currently set for September 14, 2015 is VACATED and reset to October 26, 2015 at 9:00 AM in Courtroom D in Peoria before Judge Joe Billy McDade. Supplemental Final Pretrial Conference currently set for September 10, 2015 at 11:00 AM in Courtroom D in Peoria before Judge Joe Billy McDade is VACATED and reset to October 14, 2015 at 1:30 PM in the same location. The Court finds that it is in the interest of justice to find the time from today to 10/26/2015 excludable pursuant to the Speedy Trial Act.

Entered this <u>26th</u> day of August, 2015.

                                                                     s/ Joe B. McDade
                                                                     JOE BILLY McDADE

                                                  United States Senior District Judge